UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JASWINDER SINGH,<br><br>Petitioner,<br><br>v.<br><br>WARDEN NORTHWEST ICE PROCESSING CENTER, et al.<br><br>Respondents. | CASE NO. 2:26-cv-03580-LK<br><br>ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS |

This matter comes before the Court on Petitioner Jaswinder Singh's Petition for Writ of Habeas Corpus. Dkt. No. 1. For the reasons described below, the Court grants the petition.[1]

## I. BACKGROUND

Singh is a citizen of India who "applied for admission to the United States at the Douglas Port of Entry in Douglas, Arizona" on May 22, 2013. Dkt. No. 5 at 1–2; Dkt. No. 6-1 at 3. On May 24, 2013, he was issued a Form I-860, Notice and Order of Expedited Removal. Dkt. No. 5 at 2. Singh indicated that he feared persecution in India and was referred to an asylum officer for a credible fear interview. *Id.* Singh "was detained and transported to a secure detention facility to await [an] interview with [an] Asylum officer." Dkt. No. 6-1 at 3. On June 18, 2013, an asylum

[1] The Court declines to hold an evidentiary hearing because the record is sufficient for adjudication of the petition. *See Owino v. Napolitano*, 575 F.3d 952, 954 (9th Cir. 2009) (holding that "the district court must hold an evidentiary hearing" where "the record is insufficient to decide whether [the petitioner's] detention is authorized by statute").

officer determined that Singh had established a credible fear of persecution in India. Dkt. No. 5 at 2. On June 25, 2013, Singh was issued a Form I-862, Notice to Appear, charging him as removable from the United States under Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(7)(A)(i)(I), and ordering him to appear before an immigration judge ("IJ") in removal proceedings. *Id.* On July 9, 2013, Singh was "paroled into the United States for a period of one year pursuant to INA § 212(d)(5), 8 U.S.C. § 1182(d)(5), with an expiration date of July 9, 2014." Dkt. No. 5 at 2. On January 8, 2014, Singh appeared with counsel for an initial master calendar hearing in immigration court, and the IJ sustained the charge of removability. *Id.* On January 8, 2014, Singh filed an application for relief from removal with the immigration court. *Id.* On September 30, 2016, the IJ administratively closed Singh's removal proceedings "based on [the Department of Homeland Security's] agreement to exercise prosecutorial discretion." *Id.*; Dkt. No. 6-3 at 2. Both Singh and the government waived an appeal of the administrative closure. Dkt. No. 6-3 at 2. While released, Singh remained in the United States, owned a trucking company, and worked as a truck driver. Dkt. No. 1 at 2.

Almost nine years later, on June 5, 2025, "DHS moved the immigration court to recalendar Singh's removal proceedings." Dkt. No. 5 at 3. In December 2025, he was apprehended by U.S. Border Patrol at a vehicle checkpoint near Encino, Texas, and was arrested and transported to a detention center for further processing. *Id*. The United States District Court for the Southern District of Texas denied Singh's petition for a writ of habeas corpus on March 26, 2026, finding that he was not entitled to a bond hearing. Dkt. No. 1-1. On April 16, 2026, an IJ held an individual calendar hearing on the merits of Singh's application for relief from removal, denied all relief, and ordered Singh removed to India. Dkt. No. 6-6 at 2–6. Singh filed a timely appeal with the Board of Immigration Appeals ("BIA") on April 30, 2026, which remains pending. Dkt. No. 5 at 3.

On July 10, 2026, Singh filed a motion for a bond redetermination hearing in immigration court. *Id.* An IJ held a bond hearing on July 14, 2026, and denied Singh's request for bond, determining that he lacked jurisdiction to redetermine bond because Singh was mandatorily detained under 8 U.S.C. § 1225(b). *Id.*; Dkt. No. 1-2. Singh did not appeal the denial of his bond redetermination request. Dkt. No. 5 at 3. On September 15, 2026, Singh was transferred to the Northwest ICE Processing Center ("NWIPC"), where he remains detained. *Id.*

Singh filed the present petition on September 23, 2026. Dkt. No. 1. He asserts that Respondents violated the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, and the INA by incorrectly detaining him under Section 1225(b) and by failing to provide him with any pre-deprivation process. *Id.* at 6–9. He seeks immediate release from custody or, alternatively, a bond hearing. *Id.* at 9. Respondents[2] filed their return on October 8, 2026. Dkt. No. 4. Singh filed his traverse on October 9, 2026. Dkt. No. 7.

## II. DISCUSSION

### A. Legal Standard

The Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in custody in violation of the

[2] Although the warden of the NWIPC has not appeared in this case, (1) the purpose of naming the petitioner's custodian is to effectuate injunctive relief where appropriate, *see Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (the custodian has "the power to produce the body of [the petitioner] before the court or judge," such that "he may be liberated if no sufficient reason is shown to the contrary" (citation modified)); and (2) federal respondents often represent the warden's interests, as they do in this case, *see Doe v. Garland*, 109 F.4th 1188, 1196 (9th Cir. 2024) ("Even in cases where private contract wardens are named as respondents, the government can and has stepped in to defend its interest in keeping petitioners detained.").

Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

Under the Due Process Clause of the Fifth Amendment to the United States Constitution, no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The Fifth Amendment guarantees due process in deportation proceedings." *Torres Aguilar v. I.N.S.*, 246 F.3d 1267, 1270 (9th Cir. 2001). "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Demore v. Kim*, 538 U.S. 510, 523 (2003) (recognizing that Fifth Amendment due process protections extend to deportation proceedings, but noting that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process").

**B. Singh has Established a Due Process Violation**

Singh contends that he is detained under 8 U.S.C. § 1226(a) because "it is undisputed that [he] was not arrested at the border" but was instead "detained in December 2025 after living in this country for more than a decade[.]" Dkt. No. 1 at 4. He also asserts that even if he were detained under 8 U.S.C. § 1225(b), he would "nevertheless be entitled to relief under the factors set forth in *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1106 (W.D. Wash. 2019)." *Id.* at 5. Respondents disagree, arguing that Singh is subject to mandatory detention under 8 U.S.C. § 1225(b)(2) because he "was immediately taken into custody when he applied for entry and then released on parole under 8 U.S.C. § 1182(d)(5)." Dkt. No. 4 at 7. They contend that his parole terminated automatically when it expired, and no notice of termination was required. *Id.*

Assuming without deciding that under these circumstances, the governing statute is 8 U.S.C. § 1225(b)(2), Singh has demonstrated that the government failed to follow federal law in detaining him.

1. Applicability of the Due Process Clause

The Supreme Court has noted important distinctions "between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber,* 357 U.S. 185, 187 (1958). "In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Id.* "[O]nce [a noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

The "entry fiction" extends this distinction "to some individuals within the United States but who, as a result of their status, are deemed technically to be outside." *Xi v. I.N.S.*, 298 F.3d 832, 837 (9th Cir. 2002). For example, "[w]hen [a noncitizen] arrives at a port of entry—[such as] an international airport—the [noncitizen] is on U. S. soil, but the [noncitizen] is not considered to have entered the country for the purposes of this rule." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). In other words, "[noncitizens] who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). The Supreme Court has held this to mean that a noncitizen in such

circumstances is limited to "only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added).

"But the Supreme Court has never applied the entry fiction doctrine to a case like this—to constitutionally justify the *detention* of a person living freely, for years, within the United States—and its expansion here cannot be justified." *Rincon v. Hyde*, No. CV 25-12633-BEM, 2025 WL 3122784, at *2 (D. Mass. Nov. 7, 2025) (emphasis added); *see also Padilla v. United States Immigr. & Customs Enf't*, No. 24-2801, 2026 WL 2822044, at *19 (9th Cir. Sept. 21, 2026) ("*Thuraissigiam* was an admission, not a detention, case."); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 147, 151 (W.D.N.Y. 2025) ("While *Thuraissigiam* forecloses the argument that [petitioner] has due process rights beyond those provided by statute concerning the process for deciding whether or not he will be *admitted* to this country, it does not foreclose his arguments regarding parole revocation and release."). As the court observed in *Rincon*,

> "The proper use of legal fiction is to prevent injustice." *Union Refrigerator Transit Co. v. Commonwealth of Kentucky*, 199 U.S. 194, 208 (1905) ("*[I]n fictione juris semper aequitas existit.*" (quoting 3 William Blackstone, *Commentaries* *43) ["Within a legal fiction, equity always resides."]). Pretending that Petitioner never entered the United States not only subordinates fact to fiction, it disregards the plain meaning of the Due Process Clause, which promises its protection to every "person" within the United States. U.S. Const. amend. V.
>
> To be sure, this has always been, to some degree, the effect of the entry fiction doctrine. *See, e.g.*, *Thuraissigiam*, 591 U.S. [at] 138–40 (holding that a non-citizen could not challenge on constitutional due-process grounds the procedure that determined his admission to the United States, even though he was detained twenty-five yards *past* the southern border). But those cases reflect a pragmatic and functional balance between two legal absolutes *not* in tension here—the Constitution's foundational prohibition against "arbitrary governmental action," *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and "the 'sovereign prerogative' of governing admission to this country," *Thuraissigiam*, 591 U.S. at 140 (quoting [*Landon v.*] *Plasencia*, 459 U.S. [21,] 32 [(1982)]. . . .
>
> While detention pending removal proceedings certainly constitutes an "aspect of the deportation process," *Demore v. Kim*, 538 U.S. 510, 523 (2003), it only collaterally implicates Congress's "sovereign prerogative . . . to decide which

> [noncitizens] to *admit*," *Thuraissigiam*, 591 U.S. at 139 (emphasis added) (quoting *Plasencia*, 459 U.S. at 32).
>
> This matters because that "sovereign prerogative," *id.*, is the basis of the judge-made rule that undergirds *Thuraissigiam* and similar cases—the so-called entry fiction doctrine, whereby a non-citizen physically present in the United States is treated "as if stopped at the border" for purposes of due process, *id.* (quoting [*Shaughnessy v. United States ex rel.*] *Mezei*, 345 U.S. [206,] 215 [(1953)].

2025 WL 3122784, at *2, 5 (parallel citations omitted). Thus, while "[g]ranting the relief requested in *Mezei* or *Thuraissigiam*—initial entrance to the United States (*Mezei*) or a more robust process toward admission (*Thuraissigiam*)—might have genuinely 'undermine[d] the sovereign prerogative of governing admission to this country,'" the same "cannot be said" with respect to a petitioner "who merely seeks to continue engaging in the same removal proceedings as before, only not from a jail cell." *Id.* at 7 (finding that, because "the fiction required to deprive Petitioner of his constitutional protections is severely disproportionate" and "nowhere in line with the reasonable workings of those prior cases," to apply the entry fiction doctrine to a case like Petitioner's "is to set aside the plain meaning of the Fifth Amendment altogether"); *see also Malunda David Gilberto Destino v. FCI Berlin, Warden, et al.*, No. 1:25-CV-374-SE-AJ, 2025 WL 4010424, at *7 (D.N.H. Dec. 24, 2025) ("In non-admission contexts, which do not directly implicate the executive's sovereign prerogative, the Due Process Clause protects liberty interests that may accrue regardless of statutory allowances.").

Here, where Singh has "lived with relative freedom in the United States for [over 12] years," the constitution does not countenance fictional erasure of his actual presence in this country—or his concomitant due process rights. *Rincon*, 2025 WL 3122784, at *6–7. As explained by the Supreme Court in *Morrissey v. Brewer*, parole "enables [the parolee] to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, and "be with family and friends and to form the other enduring attachments of

normal life." 408 U.S. 471, 482 (1972). "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, the parolee's "condition is very different from that of confinement in a prison." *Id.* Because "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions," the revocation of parole undoubtedly "inflicts a grievous loss on the parolee," and the parolee possesses a protected interest in his "continued liberty." *Id.* at 481–84 (citation modified).

This Court reiterates that humanitarian parole can establish the same kinds of liberty interests described in *Morrissey*. *Flores Torres v. Hermosillo*, No. 2:25-CV-02687-LK, 2026 WL 145715, at *5 (W.D. Wash. Jan. 20, 2026) (collecting cases). Because the constitutional process required for deprivation of those interests is not necessarily the same for "different statutory provision[s] with [their] own procedural safeguards in place," *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022), the Court addresses the statutory process required here.

2. Statutory Violation

Section 1182 provides that parole may be granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). The implementing regulations include another requirement for parole: the noncitizen must "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a noncitizen has been granted parole, it means that a DHS official with authority decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual, and that the individual did not pose a security or flight risk.

Parole automatically terminates if the noncitizen departs from the United States or "at the expiration of the time for which parole was authorized," and "no written notice shall be required" for automatic termination. 8 C.F.R. § 212.5(e)(1). Otherwise, for parole to be terminated, (1) "the

purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States"; and (2) written notice must be provided to the noncitizen. 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]").

Once a noncitizen's parole has terminated—either automatically or on notice—"any order of exclusion, deportation, or removal previously entered shall be executed." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 C.F.R. § 212.5(e)(1) ("[T]he [noncitizen] shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required."). "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] shall again be released on parole unless in the opinion of [a DHS official with authority] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i).

It appears that Singh's initial grant of parole expired on July 9, 2014, Dkt. No. 6-2 at 4, and the government does not indicate whether it took any action with respect to his parole in the over 11 years following this initial expiration, *see* Dkt. No. 5 at 2–3. The relatively bare record before the Court makes it unclear whether Singh's parole expired or was instead extended. However, regardless of whether his parole terminated automatically on July 9, 2014 or if it was extended by ICE, Singh has demonstrated that the government failed to follow federal law in detaining him.

If Singh's parole terminated automatically, as Respondents contend, Dkt. No. 4 at 7, the government was required to execute any order of exclusion, deportation, or removal "within a reasonable time"; if that could not be done, they were required to release him on parole again "unless in the opinion of [a DHS official with authority,] the public interest requires that the

[noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i); *see also id.* ("[T]he [noncitizen] *shall* again be released on parole[.] (emphasis added)). Singh's initial parole expired 12 years ago, and no order of exclusion, deportation, or removal has been executed in that time. Under the circumstances in this case—where Singh continued to live in the same community and work pursuant to a valid work authorization, Dkt. No. 6-5 at 2—the Court finds that Respondents have not effectuated any such order within a reasonable time. Furthermore, Respondents have put forth no evidence that "in the opinion of [a DHS official with authority,] the public interest requires that [Singh] be continued in custody." Therefore, 8 C.F.R. § 212.5(e)(2)(i) requires Singh's return to parole, and his detention violates ICE's own regulations. *See See Dieng v. Hermosillo*, No. 2:26-CV-00190-LK, 2026 WL 411857, at *6 (W.D. Wash. Feb. 13, 2026) (section 212.5(e)(2)(i) required petitioner's return to parole where ICE violated its own regulations); *O.F.B. v. Maldonado*, No. 25-CV-6336 (HG), 2025 WL 3277677, at *6 (E.D.N.Y. Nov. 25, 2025) ("Under these circumstances, the applicable regulatory provision requires that Petitioner 'shall again be released on parole' unless ICE has made an individualized determination that 'the public interest requires that the alien be continued in custody.' . . . Here, because no such determination has been made, Petitioner is being detained in violation of the agency's own regulations.").

If ICE instead extended Singh's parole,[3] then it could only be terminated "on notice" pursuant to 8 C.F.R. § 212.5(e)(2),[4] which requires that (1) "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that

[3] The record suggests this may be the case. As Respondents acknowledge, the sole means of release from detention pursuant to Section 1225(b) is temporary parole "for urgent humanitarian reasons or significant public benefit.'" Dkt. No. 4 at 3 (citing *Jennings v. Rodriguez*, 583 U.S. 281, 283 (2018)). As of December 2025, Singh was living and working in Texas, had run his own company for over a decade, and maintained a "valid Employee Authorization Document." Dkt. No. 6-5 at 2. Given those facts, and because the sole means of release from detention pursuant to Section 1225(b) is temporary parole "for urgent humanitarian reasons or significant public benefit," Respondents appear to have extended Singh's parole.

[4] Parole could also be terminated if Singh had left the United States, 8 C.F.R. § 212.5(e)(1), but neither party suggests he has done so.

"neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States"; and (2) written notice must be provided to the noncitizen. 8 C.F.R. § 212.5(e)(2)(i). Respondents have offered no evidence that they provided Singh with the written notice required by 8 C.F.R. § 212.5(e)(2)(i), even to this date. Nor have they put forth any evidence that "the purpose for which parole was authorized" has been accomplished or that a relevant official opined that "neither humanitarian reasons nor public benefit warrants the continued presence" of Singh in the United States. *See generally* Dkt. Nos. 4–6.

Based on the above analysis, the Court concludes that Respondents violated Singh's statutory rights in detaining him, whether his parole has terminated or not. *See Gabriel v. Bondi*, No. 25-CV-4298 (KMM/EMB), 2025 WL 3443584, at *6 (D. Minn. Dec. 1, 2025) ("Without any suggestion that such a determination [as that required under the statute and regulation] occurred, Respondents could not have complied with § 1182(d)(5)(A) and Part 212.5(e)(2)(i) in revoking Petitioner's parole," and accordingly, "the revocation, and[] . . . Petitioner's detention[] is unlawful.").[5]

3. Due Process Violation

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the

[5] *See also Delfin-Ricardo v. Noem*, No. 26-CV-136-RSH-BJW, 2026 WL 353357, at *2 (S.D. Cal. Feb. 9, 2026) ("Courts have determined, in cases where DHS fails to follow its own regulations in revoking humanitarian parole, that the resulting detention is unlawful and the petitioner's release should be ordered."); *Savane v. Francis*, 801 F. Supp. 3d 483, 491–92 (S.D.N.Y. 2025) ("Respondents' revocation of . . . parole under § 1182(d)(5)(A) without any process violated Petitioner's due process rights . . . because [Respondents] did not comply with the statutorily required process for revoking that parole."); *Orellana v. Francis*, No. 25-CV-04212 (OEM), 2025 WL 2402780, at *7 (E.D.N.Y. Aug. 19, 2025) (reasoning that "by failing to lawfully revoke [Petitioner's] parole, Respondents lacked the authority to arrest Petitioner"), *reconsideration denied in relevant part*, No. 25-CV-04212 (OEM), 2025 WL 2822640, at *4 (E.D.N.Y. Oct. 3, 2025) (finding again that "by failing to lawfully revoke [Petitioner's] parole, Respondents lacked the authority to arrest Petitioner" and reasoning "[a]s such, the revocation of Petitioner's parole was unlawful and his resulting detention invalid"); *Zavorin v. Wamsley*, No. 2:26-CV-00173-DGE, 2026 WL 309733, at *4 (W.D. Wash. Feb. 5, 2026) (granting habeas petition when Respondents revoked Petitioner's humanitarian parole without following the procedural requirements set forth in 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e)(2)(i)).

Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In analyzing a procedural due process claim, the court engages in a two-step analysis: First, the court determines whether the detainee "was deprived of a constitutionally protected liberty or property interest." *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). Second, the court examines "whether that deprivation was accompanied by sufficient procedural protections" using the test enunciated in *Mathews v. Eldridge*. *Id.* at 1179–80.

a. *Constitutionally Protected Liberty Interest*

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty th[e] [Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Noncitizens "who have once passed through our gates, even illegally," are entitled to "proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *see also Zadvydas*, 533 U.S. at 693. Although merely "set[ting] foot on U.S. soil" may not be sufficient to "effect[ ] an entry" and trigger due-process protections for admissions decisions if a noncitizen is detained shortly thereafter, *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020), if a noncitizen "gain[s a] foothold in the United States," *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), or "begins to develop . . . ties" in this country, "his constitutional status changes accordingly," and he "has a right to due process," *Landon v. Plasencia*, 459 U.S. 21, 32–33 (1982); *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (distinguishing noncitizens entitled to due process from those "who ha[ve] been here for too brief a period to have become, in any real sense, a part of our population"). Put another way, "[noncitizens] who have established connections in this country have due process rights in deportation proceedings[.]" *Thuraissigiam*, 591 U.S. at 107.

As explained above, Singh has lived with relative freedom in the United States for over 12 years, and he possesses a protected interest in his "continued liberty." *Morrissey*, 408 U.S. at 481–84 (citation modified).

b. *Procedural Protections*

To determine what procedures are constitutionally sufficient to protect petitioner's liberty interest, courts analyze the three *Mathews* factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. In *Rodriguez Diaz v. Garland*, the Ninth Circuit assumed without deciding that Mathews' three-part test applies in "the immigration detention context," 53 F.4th at 1206–07, and district courts have applied the *Mathews* test in that context, *see*, *e.g.*, *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1033 (N.D. Cal. 2025).

With respect to the first factor, as discussed above, Singh has a weighty private interest in remaining out of immigration detention. *See Morrissey*, 408 U.S. at 482. Despite his liberty interest being "indeterminate" under humanitarian parole, that interest "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the [noncitizen] and often on others." *Id.* This factor favors Singh.

Turning to the second factor, for the reasons stated in this Court's order in *Flores Torres*, due process at least requires that (1) the government justify the basis for re-detention, as prescribed by the statute and its implementing regulations, and (2) Singh be given "the opportunity to be heard" with respect to the government's basis for re-detention under the applicable statutory and regulatory framework "at a meaningful time and in a meaningful manner." 2026 WL 145715, at

*7 (citation modified). Here, as discussed above, the government did not follow the procedures required by its own regulations—whether or not Singh's parole was terminated.[6] The risk of erroneous deprivation is significant where the government fails to follow its own procedures, thus depriving the noncitizen of process due prior to being detained. "[T]he additional procedural safeguards identified in 8 C.F.R. § 212.5 are not only valuable for preventing the erroneous deprivation of an important interest, they are required by the Section 1225 statutory scheme[.]" *O.F.B.*, 2025 WL 3277677, at *7; *see also de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at *8 (D. Kan. June 24, 2020) ("[T]he applicable statutory process shapes Petitioner's procedural due-process rights[.]"). This factor favors Singh.

With respect to the last factor, "the government's interest in efficient administration of the immigration laws at the border is not impermissibly burdened by affording the process laid out in 8 C.F.R. § 212.5 because it is required to follow its own regulations." *O.F.B.*, 2025 WL 3277677, at *7 (citation modified). Therefore, this factor too weighs in favor of Singh.

Under *Mathews*, the Court finds that Respondents failed to provide Singh with the procedures due to him under the Due Process Clause, and accordingly, his detention is unlawful.

[6] *See Lopez v. Noem*, No. CV-GLR-25-3662, 2025 WL 3496195, at *5 (D. Md. Dec. 5, 2025) (finding that there was a high risk of erroneous deprivation because "the Government's failure to comply with its own agency regulations necessarily deprive[d] [petitioner] of the procedural process due her, rendering her current detention unlawful"); *J.L.R.P. v. Wofford*, No. 1:25-CV-01464-KES-SKO (HC), 2025 WL 3190589, at *9 (E.D. Cal. Nov. 14, 2025) (finding that the risk of erroneous deprivation was high where "ICE revoked petitioner's release on the grounds that his removal was reasonably foreseeable, but it did not provide petitioner the process required by its own regulations, it forced petitioner to file a habeas petition to obtain relief, and [it] has failed to identify any evidence that petitioner's removal was actually reasonably foreseeable at any point"); *Salazar v. Casey*, No. 25-CV-2784 JLS (VET), 2025 WL 3063629, at *4 (S.D. Cal. Nov. 3, 2025) ("[T]he risk of an erroneous deprivation of [petitioner's] interest [in remaining out of custody pursuant to her humanitarian parole] is high as Petitioner's parole was revoked without providing her a reason for revocation or giving her an opportunity to be heard"); *Munoz Materano v. Arteta*, No. 25-CV-6137-ER, 2025 WL 2630826, at *14 (S.D.N.Y. Sept. 12, 2025) (finding a risk of erroneous deprivation where "Respondents provide[d] no indication that an individualized determination was made as to the revocation of [Petitioner's] parole; nor d[id] they articulate, even now, either that the purpose for which [Petitioner's] parole was authorized has been accomplished, [ ]or that neither humanitarian reasons nor public benefit warrants his continued presence in the United States.").

## III. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus, Dkt. No. 1, is GRANTED, and the Court ORDERS as follows:

1. Respondents shall release Singh from custody within 24 hours of this Order, subject to the terms of his most recent parole agreement;

2. The parties shall file a Joint Status Report by October 19, 2026, confirming that Singh has been released;

3. Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Michelin v. Warden Moshannon Valley Corr.* Ctr., No. 24-2990, 2026 WL 263483, at *10 (3d Cir. Feb. 2, 2026) (the Equal Access to Justice Act authorizes the award of attorney's fees to petitioners who prevail against the Government in immigration habeas actions); *Daley v. Ceja*, 158 F.4th 1152, 1162 (10th Cir. 2025) (same); *Vacchio v. Ashcroft*, 404 F.3d 663, 668 (2d Cir. 2005) (same); *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009) (granting fee award to immigration detainee who prevailed on habeas petition); *Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985) (reasoning that an award of fees under EAJA was not necessarily foreclosed for a habeas petition brought by "a nonresident [noncitizen]" in the immigration context); *but see Barco v. Witte*, 65 F.4th 782, 785 (5th Cir. 2023) (holding that EAJA does not authorize attorney's fees for successful 28 U.S.C. § 2241 motions); *Obando-Segura v. Garland*, 999 F.3d 190, 197 (4th Cir. 2021) (same). Time spent on work that is "excessive, redundant, or otherwise unnecessary" is not compensable. *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citation modified). For example, attorneys may not seek compensation for time spent developing a habeas petition template

when such template was merely re-used in the instant proceeding; only the time spent dedicated to this proceeding is compensable. *See Eve Nevada, LLC v. Derbyshire*, No. 21-0251-LK, 2022 WL 279030, at *10 (W.D. Wash. Jan. 31, 2022).

Dated this 16th day of October, 2026.

Lauren King
United States District Judge